UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                            Case No. 07-20485

v.                                     Paul V. Gadola
                                           U.S. District Judge

JAMES LAMONT BARKSDALE,

                                      Michael Hluchaniuk
        Defendant.                    U.S. Magistrate Judge

_____/

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION TO SUPPRESS

I.     **PROCEDURAL HISTORY**

On October 9, 2007, defendant James Lamont Barksdale was indicted and

charged with one count of possessing five grams or more of cocaine base with the

intent to distribute on July 26, 2007, and with one count of being a felon in

possession of a firearm also on July 26, 2007.  (Dkt. # 3).  Defendant filed a

motion to suppress evidence on October 29, 2007, alleging that the search by law

enforcement officers of defendant's person and his residence on July 26, 2007 was

in violation of his constitutional rights and that the resulting seizure of evidence

and any statements made by defendant to law enforcement authorities should be suppressed.  (Dkt. # 11).

The government responded to defendant's motion claiming that there was "probable cause" to believe that defendant was engaged in drug trafficking on July 26, 2007 and, therefore, an "investigative stop" of defendant's vehicle was proper. (Dkt. # 15).  The government also claimed that the stop of defendant's vehicle was proper based on a traffic violation associated with the use of a "paper" license plate.  *Id*.  According to the government, not only were the events following the stop of defendant's vehicle proper, but the seizure of drugs from defendant initially resulted from defendant's abandonment of the drugs and, later, from a search incident to defendant's arrest.  *Id*.  The government also contends that the subsequent search of defendant's residence was based on defendant's valid consent to conduct the search.  *Id*.

On January 16, 2008, this motion was referred to the undersigned by District Judge Paul V. Gadola for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (Dkt. # 16).  Based on that referral, an evidentiary hearing was held on January 25, 2008.  Following the hearing, a transcript of the testimony was prepared and the parties filed supplemental memoranda reflecting their respective positions based on the testimony at the hearing.  (Dkt. # 17, 19, 21).  Based on the

submissions of the parties and the results of the evidentiary hearing, it is

**RECOMMENDED** that the motion to suppress be **DENIED**.

## II.    STATEMENT OF FACTS

Four witnesses testified at the evidentiary hearing.  The first of those

witnesses was Jeff Antcliff, a deputy with the Genesee County Sheriff's

Department.  Dep. Antcliff testified that he was working on the evening of July 26,

2007 and was "asked" to do an investigative stop of a white mini van. (Dkt. # 17,

Evidentiary Hearing Transcript), p. 6).  Dep. Antcliff was a canine officer in

uniform and driving a marked police vehicle.  He knew little or nothing about the

case in which he would become involved at the time the request was made of him.

At some point before activating his overhead lights for the purpose of stopping the

white mini van, Dep. Antcliff realized he could not see a license plate on the

vehicle and concluded that it had none. (Hrg. Tr., p. 32).  While Dep. Antcliff

testified that his belief that the license plate was absent was one of the reasons he

stopped the white mini van, he also said that he would have stopped the vehicle

regardless of the license plate issue because he had been instructed to do so for

investigative purposes. (Hrg. Tr., p. 31).

After the vehicle was stopped, Dep. Antcliff walked up to the vehicle and

noticed that there was a temporary "paper" license plate on the vehicle located in

the normal location for license plates. (Hrg. Tr., p. 7). Other than the difficulty he had with seeing the "paper plate" from a distance, Dep. Antcliff did not note any other problems with the license plate. He apparently paid no further attention to the license plate issue and proceeded to engage the driver, who was the sole occupant. The driver, later identified as defendant, was immediately "asked" to step out of the vehicle and patted down by Dep. Antcliff, with negative results. *Id*.

Dep. Antcliff then asked defendant if there were any "weapons or contraband" in the vehicle to which defendant said "no" and additionally said that "if [Dep. Antcliff] wanted to take a look in the vehicle that [he] could." (Hrg. Tr., p. 8). Dep. Antcliff had not, in his view, requested permission to search the vehicle but defendant's offer to allow a search of the vehicle was accepted. Other officers (Sgt. Wright and Sgt. Muddy) arrived at the scene of the traffic stop and it was those officers who were going to conduct the search of the vehicle. *Id*.

When it was clear that a search of defendant's vehicle was going to take place, Dep. Antcliff "asked" defendant to sit in the passenger compartment of Dep. Antcliff's police vehicle for "his safety" and for the officer's "safety." Dep. Antcliff testified that defendant was not forced to get in the car, he was not handcuffed, and Dep. Antcliff had not drawn his gun at any point. (Hrg. Tr., p. 9). Dep. Antcliff's vehicle was occupied by his police dog, a German Shepard, which

was inside a steel and plexiglass crate. (Hrg. Tr., pp. 10, 22). Dep. Antcliff

informed defendant about the presence of the dog before defendant entered the

vehicle and warned defendant that the dog would initially be "protective of his

area" but would calm down after a short period of time. *Id*. The door of the police

vehicle where defendant was seated could not be opened from the inside. (Hrg.

Tr., p. 22).

The traffic stop had taken place in a "high traffic area" and Dep. Antcliff

testified that he decided "for the interest of Mr. Barksdale and the investigation and

for safety purposes" to move both his vehicle (with defendant inside) and

defendant's vehicle (driven by another officer) to the parking lot of a church,

approximately two hundred yards from the site of the initial stop. (Hrg. Tr., pp.

11-12, 23). Defendant's vehicle was moved without the permission of defendant.

(Hrg. Tr., p. 23). Once the vehicles arrived at the secondary location, Dep. Antcliff

opened the door of his vehicle and allowed defendant to step out and the other

officers conducted the search of defendant's vehicle. (Hrg. Tr., p. 12). Defendant

had been inside Dep. Antcliff's vehicle for "less than a minute." (Hrg. Tr., p. 30).

While the search was conducted, Dep. Antcliff questioned defendant further

regarding the possibility of contraband on his person. (Hrg. Tr., p. 13). Dep.

Antcliff did not advise defendant of his *Miranda* rights or inform him of a right to

refuse to do what the officer asked him to do. (Hrg. Tr., p. 29). Defendant denied

that he had any contraband on his person and then Dep. Antcliff "asked" him to

remove his shoes and socks, which defendant did with negative results. (Hrg. Tr.,

p. 13).

Dep. Antcliff then asked defendant if he had "any contraband stuffed down

his groin area" to which defendant responded "no" and then, without being asked,

defendant began to undo his pants in an apparent attempt to show Dep. Antcliff his

"groin" area. (Hrg. Tr., p. 13). During this process, Dep. Antcliff noticed a "clear

plastic baggie" somewhere on defendant's person. He began to ask defendant

about that when defendant "threw" the clear plastic baggie into the police vehicle.

(Hrg. Tr., pp. 13-14). The contents of the clear plastic baggie appeared to Dep.

Antcliff to be crack cocaine and at that point, "less than five minutes" after the

initial traffic stop, defendant was arrested and placed in handcuffs. (Hrg. Tr., p.

14). A second quantity of suspected contraband was found "behind the belt buckle

area" of defendant following his arrest. (Hrg. Tr., p. 15). Dep. Antcliff then

transported defendant to the Genesee County Jail and had no further contact with

him. (Hrg. Tr., p. 15). Throughout the time he had contact with defendant, Dep.

Antcliff described him as "cooperative." *Id*.

The second witness to testify was Terence Green, a lieutenant with the Genesee County Sheriff's Department. (Hrg. Tr., p. 32). Lt. Green was in charge of an undercover narcotics unit for the Sheriff's Department and had some familiarity with the residence at 1347 Holtslander in Flint based on investigative work that began in November of 2006. (Hrg. Tr., p. 33). Lt. Green was aware of a search warrant that had been executed at that location, apparently in November of 2006, resulting in the seizure of crack cocaine. Ten people were in the residence at the time of the execution of the search warrant and Lt. Green identified Russell Curl and Luther Pitman as two of the ten people. (Hrg. Tr., p. 34). Around that time, Lt. Green received "information" from an unidentified source that the person "overseeing" the drug activity at Holtslander was "Mack," who was "identified as James Barksdale." (Hrg. Tr., p. 34). No explanation was provided for how Lt. Green concluded that "Mack" was James Barksdale.

Lt. Green and other members of his unit began to conduct surveillance of defendant and linked him to three vehicles and two other residences besides the Holtslander residence. (Hrg. Tr., p. 35). In January of 2007, defendant and Luther Pitman were seen in a vehicle, defendant being the driver, and Lt. Green instructed Dep. Antcliff to stop the car. Luther Pitman was found to be in possession of approximately two ounces of crack cocaine. Pitman told Lt. Green that the crack

cocaine had really been defendant's and that defendant had tossed it in Pitman's lap as the police were conducting the traffic stop. Pitman, however, "decided to confess and take the charge for Mr. Barksdale." (Hrg. Tr., p. 36). Pitman also told Lt. Green that defendant made crack cocaine and supplied it to people at the Holtslander residence. (Hrg. Tr., p. 36).

Between January of 2007 and July 26, 2007, Lt. Green's unit followed defendant and observed him at the Holtslander residence on "several different occasions." (Hrg. Tr., p. 37). A Genesee Township police officer informed Lt. Green's unit that a "drug related homicide" had been committed at the Holtslander residence, although the record does not disclose a date on which the homicide took place. (Hrg. Tr., p. 37). Lt. Green also learned that defendant had prior convictions for a drug trafficking offense and a firearm offense. *Id*.

On July 26, 2007, Lt. Green observed defendant leaving the Holtslander residence in a white mini van and passed that information on to other officers in his unit. (Hrg. Tr., p. 38). Lt. Green could not read the plate on the mini van. (Hrg. Tr., pp. 38-39). The traffic stop of defendant's vehicle was initiated at that point and Lt. Green was in the area of the traffic stop but did not participate. (Hrg. Tr., p. 39).

After defendant was arrested, Lt. Green went to the Sheriff's Department and met with him. The meeting took place in an interview room in the detective bureau rather than inside the jail. (Hrg. Tr., p. 58). Lt. Green read him his "constitutional rights" and defendant signed a form acknowledging and waiving those rights. (Hrg. Tr., p. 39; Ex. 1). The form was signed at 11:05 p.m. Following the signing of the advice of rights form, defendant wrote out a statement acknowledging that he was going to sell the drugs that were in his possession. (Hrg. Tr., p. 43). Lt. Green testified that he did not make any threats or promises to defendant regarding his statement and that defendant "volunteered" the information in the statement. (Hrg. Tr., p. 44). Throughout the interview, Lt. Green was in plainclothes and was not in possession of a firearm. (Hrg. Tr., pp. 40, 45). Defendant was cooperative during the interview with Lt. Green. (Hrg. Tr., pp. 45-46). After the written statement was completed, Lt. Green asked defendant about the possibility of additional drugs at his residence and defendant signed a consent to search form allowing the officers to search the house. (Hrg. Tr., pp. 45-47; Ex. 3). The consent form included a provision that indicated defendant had a right to refuse to consent to the search. (Ex. 3). After the consent was signed, defendant was transported back to his residence and "released pending further investigation." (Hrg. Tr., p. 48).

The third government witness was Scott Wright, a detective sergeant with the Genesee County Sheriff's Department and the lead officer involved in the investigation relating to defendant. (Hrg. Tr., pp. 68-69). Sgt. Wright was also aware of the search warrant at Holtslander in November of 2006. He said that he had been informed that someone with a street name of "Mack" was responsible for the drug operation at Holtslander and that the officers "determined," without explaining how the determination was made, that the person named "Mack" linked to Holtslander was defendant. However, he acknowledged that he had no "independent knowledge" that linked defendant to drug activity at Holtslander. (Hrg. Tr., p. 86). Sgt. Wright further testified that the Genesee Township Police Department provided them information about the "drug related homicide" that had taken place at Holtslander, although he had no information connecting defendant to that homicide. (Hrg. Tr., pp. 70, 86).

Sgt. Wright was also aware of the January 2007 traffic stop of a vehicle being driven by defendant, where Luther Pitman had been a passenger in the vehicle and was found to be in possession of crack cocaine. (Hrg. Tr., p. 71). Pitman, according to Sgt. Wright, stated that, after the seizure of crack from him, he had obtained the drugs from defendant and defendant supplied drugs to people at the Holtslander residence. (Hrg. Tr., p. 71).

Wright's team conducted "spot" surveillance at Holtslander between January of 2007 and July of 2007 and observed defendant or a vehicle linked to defendant at the house between 35 and 50 times. (Hrg. Tr., p. 72). Sgt. Wright did not know who was living at the house during this time period. (Hrg. Tr., p. 87). When a vehicle associated with defendant was seen at the house on July 26, 2007, Sgt. Wright directed that an "investigative traffic stop" be conducted of that vehicle after it left the Holtslander residence. (Hrg. Tr., p. 73). After defendant was arrested, he was taken to the Genesee County Jail and Sgt. Wright observed the interview of him conducted by Lt. Green in the interview room. Sgt. Wright observed, over the course of the interview, that defendant was cooperative and that Lt. Green never made any threats or promises to defendant. (Hrg. Tr., pp. 76-80). No other government witnesses testified at the hearing.

Defendant's fiancee, Natalie Allen, testified that she owned the white mini van that had been driven by defendant on July 26, 2007 at the time of his arrest. (Hrg. Tr., pp. 96-97). She stated that the vehicle had been impounded in June of 2007 as a result of someone driving it without a driver's license. When the car was released, a paper license was issued for it rather than the metal plate that had been on the vehicle. (Hrg. Tr., p. 97). That paper license plate was on the vehicle until after defendant was arrested. (Hrg. Tr., p. 99). It was mounted on the vehicle at the

Report and Recommendation
Defendant's Motion to Suppress Evidence
*United States v. Barksdale*, Case No. 07-20485

same location the metal plate is normally mounted. *Id*. Through Ms. Allen, the actual paper license plate on the vehicle at the time of defendant's arrest was entered into evidence along with three photographs of the vehicle purportedly depicting the appearance of the license plate on the mini van at the time of defendant's arrest. (Hrg. Tr., pp. 98-101). Ms. Allen stated that, sometime before defendant's arrest, she was stopped by a police officer who told her the license was "too light" and that she should "darken" the letters. (Hrg. Tr., pp. 109-10). She indicated that, after being stopped by the police, she got a "black marker" and "traced over" the numbers on the plate to make them darker. (Hrg. Tr., p. 110). The defense also introduced two other photographs into evidence, by stipulation, which depicted the paper license plate as seen through the tinted window glass of the mini van. (Hrg. Tr., p. 111).

In rebuttal, the government re-called Lt. Green who testified that there was no license plate, paper or otherwise, in the license plate area of the mini van on July 26, 2007. (Hrg. Tr., p. 113). He also testified that the duct tape that appeared in the photographs, introduced by the defense (Exhibits 3 and 4), as securing the paper license plate to the vehicle, was not on the vehicle at the time of the traffic stop of defendant in July of 2007. (Hrg. Tr., p. 114). Dep. Antcliff was also re-called as a witness. He testified that he did not recall seeing any duct tape on the

vehicle at the time of the stop and also that the numbers on the plate were barely

legible and not as they appeared in Exhibits 3 and 4. (Hrg. Tr., p. 118).

## III.  ANALYSIS

### A.  The Stop of Defendant's Vehicle

#### 1.  Reasonable Suspicion

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court determined that it

was proper in a Fourth Amendment sense for a police officer to stop and question

individuals where the officer had a reasonable suspicion that the individuals were

engaged in or about to be engaged in criminal activity.  The Court generally

described such police conduct as "necessarily swift action predicated upon the on-

the-spot observations of the officer on the beat."  *Id*. at 20.  This determination

came with a standard that required the police officer to have "specific and

articulable facts which, taken together with rational inferences from those facts,

reasonably warrant" stopping the suspect and making an inquiry.  *Id*. at 21.  The

standard was also deemed to be an objective one such that the facts would have to

warrant a person of "reasonable caution" to believe that the action was necessary.

*Id*.  "Anything less would invite intrusions upon constitutionally guaranteed rights

based on nothing more substantial than inarticulate hunches, a result [the Supreme

Court] has consistently refused to sanction." *Id*. at 22.

These type of encounters by the police and individuals have come to be known as investigatory stops or *Terry* stops. Courts reviewing the propriety of an investigatory stop must look at the totality of the circumstances to determine if the officer had a particularized and objective basis for suspecting criminal activity. Additionally, officers are allowed to rely on their training and experience to draw inferences and make deductions about the information available to them. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Defendant claims that there was inadequate information to establish a reasonable suspicion that defendant was, or was about to be, engaged in criminal activity. Therefore, the investigatory stop of defendant was improper and any evidence obtained as a result, was seized in violation of defendant's Constitutional rights. The government contends that there was a reasonable suspicion for the investigatory stop based on (1) the seizure of drugs from 1347 Holtslander in November of 2006 and the information that defendant was "overseeing" drug distribution there, (2) the understanding that there had been a drug related homicide at 1347 Holtslander, (3) the apparent presence of defendant at 1347 Holtslander on numerous occasions between January and July of 2007, (4) defendant's prior convictions for drug and firearm offenses, (5) the arrest of Luther Pitman in January of 2007 in a car with defendant and Pitman's statement that the

Report and Recommendation
Defendant's Motion to Suppress Evidence
*United States v. Barksdale*, Case No. 07-20485

drugs in Pitman's possession came from defendant and that defendant was

"cooking and selling" crack at 1347 Holtslander, and (6) the fact that defendant

was at 1347 Holtslander in July of 2007 and drove away from that location with an

improper license plate on his vehicle.

2.      Suspicion of Criminal Conduct

On July 26, 2007, defendant was observed leaving 1347 Holtslander, Flint,

Michigan in a white mini van.  Sgt. Scott Wright decided to have Dep. Antcliff, a

uniformed officer, conduct an investigative stop of the vehicle that defendant was

driving. (Hrg. Tr., p. 73).  The government contends that the officers had a

"reasonable and articulable basis" to believe that defendant was engaged in

criminal activity on that date based on the six factors listed above.

While it is clear that the totality of the circumstances must be taken into

account in determining if a "reasonable" officer would have formed an appropriate

suspicion of criminal activity, some attention must be paid to the individual factors

in assessing whether the factors add up to a "reasonable suspicion."  With respect

to the facts relating to the search of 1347 Holtslander in November of 2006, the

evidence does not establish who provided the information relating to defendant's

purported involvement in drug trafficking at that residence.  Additionally, the

apparent source of the information indicated that someone named "Mack" was the

supplier of drugs to people at the residence at that time and the officers concluded, without establishing how the conclusion was reached, that defendant was the person named "Mack."  Defendant was not in the house at the time the search warrant was executed and no additional information linked defendant to the residence.  Further, this information was obtained eight months before the traffic stop of defendant.  The information is perhaps not even as significant as that from an "anonymous tip" and "[r]arely can an anonymous tip by itself constitute a basis for reasonable suspicion." *United States v. Hudson*, 405 F.3d 425, 432 (6th Cir. 2005).  This information falls short of even an "anonymous tip" because the officers had to reach the conclusion that the information related to defendant, as opposed to someone else using the street name "Mack," and no evidence was provided explaining how that conclusion was reached.

Similarly, the information provided by Luther Pitman in January of 2007 does not carry much weight due to the circumstances under which it was given. Mr. Pitman, who was apparently at 1347 Holtslander when drugs were found there in November of 2006, was found to be in possession of a large quantity of crack cocaine in January of 2007 and claimed, in a self-serving manner, that defendant (the driver of the car that Mr. Pitman was in) had just tossed the drugs in his lap when the police commenced to stop the car.  (Hrg. Tr., p. 36).  If truthful, this

explanation would have been a defense to a charge that Mr. Pitman was knowingly in possession of the drugs. However, Mr. Pitman apparently later pleaded guilty to being in possession of those drugs ,which casts doubt on the information originally provided. Also, this incident occurred was six months before the traffic stop of defendant.

Defendant's frequent presence at the Holtslander residence over a six month period during which there was no evidence of drug trafficking or even evidence about who was living there, also does not amount to persuasive evidence of criminal activity in July of 2007. Further, the information about a possible drug-related homicide at the Holtslander residence does not amount to persuasive evidence of criminal activity because it was not linked to defendant and was not established to have taken place during any time period that defendant was seen at or near the residence. The remaining piece of information, that defendant had a prior conviction for a drug-related offense, may have contributed to a reasonable suspicion but is not, by itself, a significant factor in determining the existence of a reasonable suspicion of criminal activity on the date in question.

A "totality of the circumstances analysis" can sometimes result in a finding that the total is greater than the sum of its parts. However, in the circumstances described above, that is not the case. A series of innocent acts can add up to a set

Report and Recommendation
Defendant's Motion to Suppress Evidence
United States v. Barksdale, Case No. 07-20485

of circumstances that rises to a reasonable suspicion. *See e.g., Arvizu, supra*, (conduct observed by a Border Patrol agent was sufficiently suspicious to experienced law enforcement officer to warrant traffic stop). In *Arvizu* and other similar cases, a series of relatively contemporaneous acts converge to establish a reasonable suspicion of ongoing criminal activity. In the present case, there was no information about acts or events that occurred within six months of the traffic stop that reasonably connected defendant to any criminal activity. Further, much of the information was suspect at best and, individually, did not carry much weight even if it had been temporally connected to the traffic stop. The temporal connection between certain facts and a "reasonable suspicion" of criminal conduct is a factor that should be examined in reviewing such circumstances. *United States v. Laughrin*, 438 F.3d 1245, 1247-48 (10th Cir. 2006) (22 week old information was "too stale" to amount to reasonable suspicion of current criminal conduct).

The government must establish that the officers who effectuated the stop of an individual are "able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The government has not done so in the present case. The objective facts associated with these circumstances indicate that the officers only had what amounted to a "hunch" that defendant was involved in

criminal activity. In this case, while the "hunch" proved to be accurate, such is not the test applied to the determination of the existence of "reasonable suspicion." Reasonable suspicion must be supported by particularized and objective facts and such facts did not exist in this instance. *United States v. Molina*, 226 Fed.Appx. 523 (6th Cir. 2007).

        3.      The License Plate Factor

An alternative theory advanced by the government that would justify the stop of defendant's vehicle in this instance was the lack of a visible license plate on the vehicle. With respect to the license plate issue, Dep. Antcliff testified that he was instructed to make an investigative stop of defendant's vehicle but before he activated the lights on his vehicle for the purpose of making the stop, he believed that the vehicle did not have a license plate and this was an alternative "legitimate" reason for stopping the vehicle. (Hrg. Tr., p. 32). Michigan traffic law requires that a registration plate for a vehicle be attached to the rear of the vehicle. M.C.L. 257.225.

The evidence at the hearing regarding the visibility of the registration plate on the vehicle is in conflict. Dep. Antcliff testified that he did not see any registration plate on the vehicle until he walked close to the vehicle after making the traffic stop. (Hrg. Tr., p. 32). While he testified that he could see a paper

license plate on the vehicle when he was close, he could not see the lettering on the plate even when he was within a few steps of the rear of the vehicle. (Hrg. Tr., p. 119). Lt. Green testified that he did not see any license plate on the vehicle on that occasion. (Hrg. Tr., pp. 113-14). The defense presented evidence that the vehicle had been impounded in June of 2007 for a traffic violation and, when it was released, a temporary paper license plate was affixed to the rear of the vehicle. (Hrg. Tr., pp. 97-99). Natalie Allen, defendant's fiancée, testified that the plate remained on the vehicle until after defendant was arrested but did not identify a date on which it was removed. (Hrg. Tr., p. 99). The paper license plate that was on the vehicle in July of 2007 (Exhibit 1) and photographs of the vehicle purportedly showing how it looked in July of 2007 (Exhibits 2, 3 and 4) were admitted at the hearing. (Hrg. Tr., pp. 98-100). An examination of the paper license plate (Exhibit 1) suggests that it is a document that has certain numbers hand-written on it at the time it is issued. It appears that the numbers were originally put on the paper license plate with ball-point pen and that writing is very faint on the exhibit. It also appears that a heavy black marker was used to trace over the numbers originally put on the plate. Ms. Allen testified that she had been stopped in June of 2007 by a police officer who told her the numbers on the plate could not be seen. (Hrg. Tr., p. 109). Ms. Allen said later that same day she used a

black marker to darken the numbers on the plate so that they could be seen. (Hrg. Tr., p. 110).

If Ms. Allen is to be believed, the lettering on the paper license plate was fairly bold at the time of the traffic stop of defendant in July of 2007. This conflicts with the testimony of both Lt. Green and Dep. Antcliff that, in July of 2007, the paper license plate did not look as it was depicted in Exhibits 2, 3 and 4. (Hrg. Tr., pp. 113-14, 117-18). Ms. Green testified that the paper license plate "wasn't taken off" the vehicle as of the time of defendant's arrest and that the manner in which it was depicted in Exhibits 2, 3 and 4 was the way it appeared in July of 2007. An examination of the photographs (Exhibits 2, 3 and 4) clearly indicates that there is residue from the duct tape to the left of the plate as shown in the photographs, which strongly suggests that the plate had been moved at some point following the initial installation. This inference is inconsistent with the testimony of Ms. Allen. Weighing the credibility of the witnesses, including the close relationship that Ms. Allen had with defendant and the inconsistency noted above, I credit the testimony of Lt. Green and Dep. Antcliff relating to their inability to see a license plate on the back of the vehicle as required by law.

If there is a reasonable suspicion of an ongoing traffic violation, a law enforcement officer may conduct a traffic stop of the vehicle involved in the

situation. *United States v. Simpson*, ___ F.3d ___, 2008 W.L. 877849 (6th Cir.

2008).[1] In the present case, Dep. Antcliff had a reasonable suspicion that

defendant was driving without a license plate on his vehicle and, therefore, he had

an appropriate basis to conduct a traffic stop of the vehicle. Under applicable law,

it simply does not matter whether Dep. Antcliff had a reasonable suspicion of drug-

related activity at the time of the stop for the traffic violation. *United States v.*

*Ferguson*, 8 F.3d 385, 391-92 (6th Cir. 1993).

---

[1] In *Simpson*, the Sixth Circuit explained some of the confusion about
whether the "reasonable suspicion" or the "probable cause" standard should be
applied during traffic stops: "Our circuit's case law on this issue has not been
entirely clear, at least with regard to traffic violations." *Id*. at *7. While the Court
expressed "grave doubts" about the viability of the probable cause standard under
any circumstances, the earliest panel on the issue (*United States v. Freeman*, 209
F.3d 464 (6th Cir. 2000)) determined that "probable cause" was required and the
*Simpson* panel had no authority to overrule that decision. *Id*. at *8. The Court,
however, distinguished the facts before it by noting that, unlike in the *Freeman*
case, which involved a single isolated incident of a vehicle drifting onto the
shoulder (i.e., a "completed" violation), *Simpson* involved an "ongoing" violation
(a violation of statute requiring registration plate to be legible and securely
fastened in visible place), for which reasonable suspicion is sufficient. Here, the
violation at issue is an "ongoing" violation like that in *Simpson* and therefore, the
"reasonable suspicion" standard is applicable.

4.    Scope of Conduct Following Traffic Stop

Defendant argues that the officers exceeded the scope of the *Terry* stop by not checking the validity of the paper license plate on the vehicle.  In the present case, Dep. Antcliff approached the vehicle following the stop and asked defendant to get out of the vehicle so that a pat down search for weapons could be conducted. He then asked defendant if there was contraband in the vehicle and defendant, in essence, consented to a search of the vehicle.  (Hrg. Tr., p. 8).  Dep. Antcliff never inquired about the validity of the paper license plate on the vehicle.  Dep. Antcliff was, however, under no obligation to inquire about the propriety of license plate. *United States v. Herbin*, 343 F.3d 807 (6th Cir. 2003) (traffic stop for running red light, driver asked for consent to search proper even if no inquiry regarding traffic offense); *Ferguson, supra*, (traffic stop for no visible plate, no inquiry regarding traffic offense before probable cause search done on car); *Simpson, supra,* (stop for improper plate and no inquiry regarding traffic offense before search of vehicle); *United States v. Taylor*, 496 F.Supp.2d 852 (S.D. Ohio 2006) (proper to ask for consent to search following traffic stop without inquiry regarding reason for stop). Thus, the officers did not exceed the scope of the *Terry* stop.

B.    The Search of Defendant's Person

Following what has been construed as defendant's consent to search his

vehicle, he was asked to sit in a police car which was moved a short distance as

was his vehicle before the search took place.  For a brief period of time, defendant

was in the police car, which also contained a police dog in a crate, while the car

was moved from the side of the road to a nearby church parking lot.  After the

move to the parking lot, defendant was allowed to get out of the police car and was

"asked" to remove his shoes and socks by Dep. Antcliff.  (Hrg. Tr., pp. 11-13).

Defendant argues that a reasonable person would not have felt free to say no to the

request for the search of his person citing, *Northrop v. Tripplett*, 265 F.3d 372 (6th

Cir. 2001) and, therefore, the consent was not voluntary.  The government argues

that the consent was voluntary.

In the instant matter, following the stop of his vehicle, defendant invited

Dep. Antcliff to search his vehicle.  Dep. Antcliff asked defendant to wait inside

his police vehicle, to which defendant agreed.  Dep. Antcliff never drew his

weapon, never put handcuffs on defendant, and never used language that was either

threatening or coercive.  Defendant remained cooperative throughout the process,

which took, in its entirety, less than five minutes.  (Hrg. Tr., p. 14).  While

defendant was asked to remove his shoes and socks (which produced no

contraband), he was not asked to undo his pants. Rather, he initiated the disclosure of the area of his waist underneath his pants by undoing his pants without any direction or even a specific request to do so. This latter action exposed the plastic baggie that Dep. Antcliff noticed before defendant tossed it inside the police car. (Hrg. Tr., p. 13).

In *Northrop,* the defendant was approached by two police officers who had received a tip that someone fitting his description was in possession of drugs in a bus station. The officers approached the defendant and detained him while they made further inquiry. The Sixth Circuit found that the officers did not have a reasonable suspicion to detain the defendant and, therefore, any consent he gave following the improper detention was not voluntary. Those facts are inapposite to the present circumstances because defendant in this case was not illegally detained. Rather, the evidence suggests that defendant was waiting for the search of his vehicle to be completed. Defendant was asked to sit in the police car during this period of time, but he was not handcuffed and he was inside the locked police car for less than a minute. (Hrg. Tr., p. 30). He was asked to sit in the car due to safety concerns and he agreed to do so. (Hrg. Tr., p. 9). Placing a person in a locked police car does not turn a situation such as that presented into an arrest that would have required probable cause in order to be legal. *United States v. Jacob,*

377 F.3d 573, 580 (6th Cir. 2004). *See also United States v. Herbin*, 343 F.3d 807, 810-11 (6th Cir. 2003) (permissible for officer to take car keys from driver and tell her to remain in area while consent search conducted). The propriety of placing a defendant in a police car is judged by the reasonableness of the officers' actions. *Jacob*, 377 F.3d at 580. In this case, the officer acted reasonably because he asked defendant to sit in the car for his safety (the stop had taken place on a busy road) and defendant agreed. Further, defendant was not in handcuffs, the officer had not *ordered* defendant to sit in the car, and he was in the car for less than a minute. Under these circumstances, defendant was not improperly placed in the car and the situation was not transformed into an illegal arrest.

With respect to the question of the voluntariness of defendant's actions, defendant was in contact with Dep. Antcliff for less than five minutes before the evidence was seized and inside the police car for less than a minute,[2] the officer did not use coercive or threatening language,[3] the officer did not draw his gun or place

---

[2] The fact that defendant was placed in the police car with a police dog is a potentially troubling factor in determining the voluntariness of defendant's actions. However, the dog was in a crate, defendant was only in the car for less than a minute, and there was no evidence that anything coercive resulted from these circumstances. The duration of the contact with law enforcement officers is a factor in determining the voluntariness of a defendant's actions. *United States v. Thompson*, 408 F.3d 994, 996 (8th Cir. 2005).

[3] If the officers engage in "objectively improper" conduct regarding a suspect, consent could be considered involuntary. *United States v. Crowder*, 62

defendant in hand cuffs, only a single officer was involved in the transaction with

defendant, defendant was cooperative throughout the transaction,[4] and no threats or

promises were made to defendant.[5]  Additionally, defendant was a mature

individual with some college education and prior contact with the criminal justice

system. [6]  Based on these factors, defendant's conduct in removing his shoes and

socks and, later, in undoing his pants, which revealed what was later determined to

be crack cocaine, was voluntary.

Defendant contends that, when he threw the plastic baggie hidden on his

person into the police car, he did not "abandon" the drugs such that a voluntary,

legal abandonment occurred.  His actions were not voluntary, he argues, because

they were the result of an illegal search of his person, which is a Fourth

Amendment violation.  The premise of defendant's argument is that the officers

_____

F.3d 782, 787 (6th Cir. 1995).

[4] Being cooperative with the officers is a demonstration of acting in a
voluntary manner.  *United States v. Elkins*, 300 F.3d 638, 648 (6th Cir. 2002).

[5] Improper threats can result in an involuntary act by a defendant.  *United
States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998).

[6] The advice of rights form that defendant signed (Exhibit 1) indicated that
defendant was 50 years old and had one year of college education.  The evidence at
the hearing indicated that defendant had prior convictions for drug and firearm
offenses. (Hrg. Tr., p. 37).  The age, education, and background of an individual
are factors that can be considered in determining voluntariness.  *United States v.
Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998); *United States v. Mitchell*, 209
F.3d 319, 324 (4th Cir. 2000).

had conducted an illegal search of defendant and, therefore, defendant's actions in throwing the drugs into the police car were not voluntary.  Neither of the cases cited by defendant, *United States v. Austin*, 66 F.3d 1115 (10th Cir. 1995) (defendant gave up expectation of privacy in bag he left with stranger in airport) and *United States v. Stephens*, 206 F.3d 914 (9th Cir. 2000) (defendant "seized" without reasonable suspicion by officers who approached him on a bus and asked him questions so abandonment of bag was not voluntary) is directly applicable to the case at hand.  As previously determined, the conduct of the officers was reasonable in a constitutional sense and, thus, there was no Fourth Amendment violation that caused defendant to "abandon" the drugs by throwing them into the police car following the questions asked by Dep. Antcliff.

C.     The Search of Defendant's House

After defendant was arrested, he was taken to an interview room in the detective bureau of the Genesee County Jail.  He was given *Miranda* warnings and later signed a consent to search form allowing the search of his residence. Defendant argues that the consent was not valid because he had been subjected to an earlier illegal search and, therefore, the consent and any evidence obtained thereunder were the "fruit of the poisonous tree," requiring suppression under *Wong Sun v. United States*, 371 U.S. 471 (1963).  For the reasons stated above, it

Report and Recommendation
Defendant's Motion to Suppress Evidence
*United States v. Barksdale*, Case No. 07-20485

has been determined that there was no earlier illegal search and, therefore, defendant's claim on this basis is unavailing. Defendant's brief does not appear to include a claim that the consent to search his residence was involuntary.

## IV.    RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that defendant's motion to suppress be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof, as provided for in 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), a copy of any objections must be served on this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not exceed

twenty (20) pages in length unless such page limit is extended by the Court. The

response shall address specifically, and in the same order raised, each issue

contained within the objections by motion and order. If the Court determines any

objections are without merit, it may rule without awaiting the response to the

objections.

Date: May 6, 2008                                    s/Michael Hluchaniuk
                                                     Michael Hluchaniuk
                                                     United States Magistrate Judge

# <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on <u>May 6, 2008</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send electronic notification to the following:<u> Nancy A. Abraham, Robert W. Haviland, and Kenneth R. Sasse</u>, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: <u>Federal Defender, Federal Defender Office, 613 Abbott, 5th Floor, Detroit, MI 48226</u>.

s/James P. Peltier        
Courtroom Deputy Clerk
U.S. District Court
600 Church Street
Flint, MI 48502
(810) 341-7850
pete_peltier@mied.uscourts.gov
